**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **KANGDI ELECTRIC VEHICLE (HAINAN) CO., LTD., ET AL,**<br>**Plaintiffs,**<br>**and**<br>**THE AMERICAN PERSONAL TRANSPORTATION VEHICLE MANUFACTURERS COALITION,**<br>**Consolidated Plaintiff,**<br>**v.**<br>**UNITED STATES,**<br>**Defendant,**<br>**and**<br>**THE AMERICAN PERSONAL TRANSPORTATION VEHICLE MANUFACTURERS COALITION AND XIAMEN DALLE NEW ENERGY AUTOMOBILE CO., LTD., INC.,**<br>**Defendant-Intervenors.** | **Before: Hon. Jane A. Restani, Judge**<br><br>**Consol. Court No. 25-00202** |

**REPONSE BRIEF OF THE AMERICAN PERSONAL TRANSPORTATION VEHICLE MANUFACTURERS COALITION**

**Robert E. DeFrancesco III, Esq.**
**Derick G. Holt, Esq.**
**Theodore P. Brackemyre, Esq.**
**Stephen A. Morrison, Esq.**

**WILEY REIN LLP**
**2050 M Street, NW**
**Washington, DC 20036**
**(202) 719-7000**

***Counsel to the American Personal Transportation Vehicle Manufacturers Coalition***

**Dated: October 26, 2026**

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. RULE 56.2 STATEMENT .......... 1

A. Determination Presented for Review .......... 1

B. Issues Presented .......... 1

III. STATEMENT OF FACTS .......... 2

IV. STANDARD OF REVIEW .......... 4

V. SUMMARY OF ARGUMENT .......... 5

VI. ARGUMENT .......... 5

A. Legal Framework .......... 5

B. Commerce's Critical Circumstances Determination for Separate Rate Companies Was Supported by Substantial Evidence and Otherwise In Accordance With Law .......... 7

1. Commerce Reasonably Declined to Conduct a Seasonality Analysis .......... 7

2. Commerce's Reliance on Import Data Under HTSUS Subheading 8703.10.5030 is Supported by Substantial Evidence .......... 10

VII. CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Blue Field (Sichuan) Food Indus. Co. v. United States*,
949 F. Supp. 2d 1311 (Ct. Int'l Trade 2013) ....................13

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962)....................5

*Consol. Edison Co. v. N.L.R.B.*,
305 U.S. 197 (1938)....................4

*Daewoo Elecs. Co. v. Int'l Union of Elec., Tech., Salaried & Mach. Workers, AFL-CIO*,
6 F.3d 1511 (Fed. Cir. 1993)....................4

*Gallant Ocean (Thailand) Co. v. United States*,
602 F.3d 1319 (Fed. Cir. 2010)....................4

*Int'l Bus. Machs. Corp. v. United States*,
152 F. 3d 1332 (Fed. Cir. 1998)....................12

*Jacobi Carbons AB v. United States*,
422 F. Supp. 3d 1308 (Ct. Int'l Trade 2019) ....................13

*N.L.R.B. v. Columbian Enameling & Stamping Co.*,
306 U.S. 292 (1939)....................4

*Nat'l Presto Indus. Inc. v. United States*,
783 F. Supp. 2d 1287 (Ct. Int'l Trade 2011) ....................12

*Peer Bearing Co.-Changshan v. United States*,
884 F. Supp. 2d 1313 (Ct. Int'l Trade 2012) ....................11

*QVD Food Co. v. United States*,
658 F.3d 1318 (Fed. Cir. 2011)....................13

*R.T. Foods, Inc. v. United States*,
757 F.3d 1349 (Fed. Cir. 2014)....................12

*Universal Camera Corp. v. N.L.R.B.*,
340 U.S. 474 (1951)....................4

*Vinh Hoan Corp. v. United States*,
179 F. Supp. 3d 1208 (Ct. Int'l Trade 2016) ....................11

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)....................4

19 U.S.C. § 1673d(a)(3)....................5

**Regulations**

19 C.F.R. § 351.206(h) ....................6

19 C.F.R. § 351.206(h)(2)....................6

**Administrative Materials**

*1,1,1,2-Tetrafluroethane from the People's Republic of China*, 79 Fed. Reg. 62,597 (Dep't Commerce Oct. 20, 2014) ....................6

*Certain Low Speed Personal Transportation Vehicles From the People's Republic of China*, 89 Fed. Reg. 57,865 (Dep't Commerce July 16, 2024) ....................2

*Certain Low Speed Personal Transportation Vehicles from the People's Republic of China*, 90 Fed. Reg. 8,517 (Dep't Commerce Jan. 30, 2025)....................3

*Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China*, 90 Fed. Reg. 26,530 (Dep't Commerce June 23, 2025) ....................1, 2, 14

*Certain Monomers and Oligomers from Taiwan*, 90 Fed. Reg. 43,409 (Dep't Commerce Sep. 9, 2025)....................10

*Certain Paper Shopping Bags from the People's Republic of China*, 89 Fed. Reg. 344 (Dep't Commerce Jan. 3, 2024)....................8, 10

*Certain Paper Shopping Bags from the People's Republic of China*, 89 Fed. Reg. 45,823 (Dep't Commerce May 24, 2024)....................8, 10

*Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China*, 80 Fed. Reg. 34,888 (Dep't Commerce June 18, 2015)....................6

*Certain Pea Protein from the People's Republic of China*, 89 Fed. Reg. 55,559 (Dep't Commerce July 5, 2024)....................10, 11

*Certain Quartz Surface Products from the People's Republic of China*, 84 Fed. Reg. 23,767 (Dep't Commerce May 23, 2019) ....................7, 8

*Certain Vertical Shaft Engines Between 99cc and Up to 225cc, and Parts Thereof, from the People's Republic of China*, 86 Fed. Reg. 14,077 (Dept. Commerce Mar. 12, 2021)....................7

*Low Speed Personal Transportation Vehicles from China*, Inv. Nos. 701-TA-731 and 731-TA-1700, USITC Pub. 5533 (Aug. 2024)............................14

*Pentafluorethene (R-125) from the People's Republic of China*, 87 Fed. Reg. 1,117 (Dep't Commerce Jan. 10, 2022)........................................................................9

*Refined Brown Aluminum Oxide (Otherwise known as Refined Brown Artificial Corundum or Brown Fused Alumina) from the People's Republic of China*, 68 Fed. Reg. 55,589 (Dep't Commerce Sep. 26, 2003)............................................................6, 7

## I. INTRODUCTION

On behalf of the American Personal Transportation Vehicle Manufacturers Coalition ("the Coalition"), consolidated plaintiff and defendant-intervenor in this action, we respectfully submit this response brief to the opening brief filed by Plaintiffs Kangdi Electric Vehicle (Hainan) Co., Ltd. and SC Autosports, LLC (collectively, "Kangdi") which challenge certain aspects of the U.S. Department of Commerce's ("Commerce") critical circumstances determination in the antidumping investigation of *Certain Low-Speed Personal Transportation Vehicles from the People's Republic of China*. *See* Pls. Kangdi Electric Vehicle (Hainan) Co., Ltd., and SC Autosports, LLC's Rule 56.2 Mot. for J. on the Agency R. (Apr. 13, 2026), ECF No. 30 ("Kangdi's Br.").

## II. RULE 56.2 STATEMENT

### A. Determination Presented for Review

Commerce published its final determination in the antidumping duty investigation under challenge as *Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China*, 90 Fed. Reg. 26,530 (Dep't Commerce June 23, 2025) (final affirmative deter. of sales at less than fair value and final affirmative deter. of critical circumstances, in part), P.R. 699 ("*Final Determination*"). Commerce laid out the bases for its determination in an accompanying issues and decision memorandum, P.R. 692 ("IDM").

### B. Issues Presented

Kangdi raises the following challenges to the *Final Determination*:

1. Whether Commerce's determination not to alter its critical circumstances determination based on seasonality was supported by substantial evidence and in accordance with law.

2. Whether Commerce's use of import data under Harmonized Tariff Schedule of the United States ("HTSUS") subheading 8703.10.5030 in its critical circumstances

analysis was supported by substantial evidence and otherwise in accordance with law.

## III. STATEMENT OF FACTS

Commerce initiated the antidumping investigation of low speed personal transportation vehicles ("LSPTVs") from the People's Republic of China on July 10, 2025, following receipt of a petition filed with Commerce and the United States International Trade Commission (the "Commission") by the Coalition on June 20, 2024. *See Certain Low Speed Personal Transportation Vehicles From the People's Republic of China*, 89 Fed. Reg. 57,865 (Dep't Commerce July 16, 2024) (initiation of less-than-fair-value invs.), P.R. 50.

The Coalition subsequently filed a critical circumstances allegation, alleging that there had been massive imports of LSPTVs from China over a relatively short period of time. *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Low-Speed Personal Transportation Vehicles from the People's Republic of China: Critical Circumstances Allegations* (Oct. 22, 2024) at 11-12, C.R. 247, P.R. 298 ("Critical Circumstances Allegation"). To substantiate its critical circumstances allegation, the Coalition relied on import data under HTSUS subheading 8703.10.5030, which is the primary tariff classification under which LSPTVs are typically imported into the United States. *See id.* at 12 & n.41, Exhibit 5; *see also Final Determination*, 90 Fed. Reg. at 26,534 ("LSPTVs subject to this investigation are typically classified in the {HTSUS} at subheading 8703.10.5030."). No parties challenged the critical circumstances allegation or provided factual information to support a claim that imports of LSPTVs were seasonal. *See, e.g.*, IDM at 15 ("{N}either respondent . . . placed timely data on the record demonstrating that trade in LSPTVs is seasonal.").

Commerce reached an affirmative preliminary critical circumstances determination with respect to mandatory respondents, as well as for separate rate companies and "China-wide entity"

companies. *See* Decision Memorandum accompanying *Certain Low Speed Personal Transportation Vehicles from the People's Republic of China*, 90 Fed. Reg. 8,517 (Dep't Commerce Jan. 30, 2025) (prelim. affirmative deter. of sale at less-than-fair-value inv., prelim. affirmative deter. of critical circumstances, postponement of final deter. and extension of provisional measures), P.R. 575 ("PDM"); Memorandum from Gorden Struck to The File, re: *Preliminary Analysis of Critical Circumstances* (Jan. 23, 2025), C.R. 608, P.R. 578 ("Prelim. Critical Circumstances Analysis"). To determine whether imports had been "massive" over a short period of time, Commerce analyzed Global Trade Atlas ("GTA") import data under HTSUS 8703.10.5030, adjusted for shipments reported by mandatory respondents. *See* PDM at 36, Prelim. Critical Circumstances Analysis at 2, Attachments 1-2. Using this data, Commerce found that imports under HTSUS 8703.10.5030 increased by more than 15 percent between the base period and comparison period. *See* Prelim. Critical Circumstances Analysis at 2, Attachment 1; PDM at 35-36.

Following the preliminary determination, parties submitted administrative case and rebuttal briefs. In its case brief, Kangdi argued that the GTA import data did not accurately account for all subject merchandise entries into the United States during the base and comparison periods and could not be used as the basis to make a critical circumstances determination. Kangdi also argued that Commerce failed to consider that the increase in imports from the base to comparison period was the result of seasonal trends. *See* Letter from Thompson Hine LLP to Sec'y Commerce, re: *Certain Low Speed Personal Transportation Vehicles from the People's Republic of China (A-570-176): Case Brief of Kangdi Electric Vehicle (Hainan) Co., Ltd.* (May 14, 2025) at 2-8, C.R. 663, P.R. 659 ("Kangdi's Case Br.").

On June 23, 2025, Commerce issued its final determination. Commerce continued to find that critical circumstances existed for separate rate companies, including Kangdi. IDM at 4-7. Commerce continued to base its critical circumstances analysis using GTA import data under HTSUS 8703.10.5030. *Id.* at 13; Mem. from David Crespo to The File, re: *Critical Circumstances Analysis for the Final Determination* (June 16, 2025) at 2, Attachments 1-2, C.R. 676-677, P.R. 695-696 ("Final Critical Circumstances Analysis").

This appeal followed.

## IV. STANDARD OF REVIEW

The U.S. Court of International Trade reviews Commerce's decisions in antidumping duty proceedings to determine whether those decisions are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). It must be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." *N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In determining whether Commerce's determination is supported by substantial evidence, the court, "reviews the record as a whole, including any evidence that fairly detracts from the substantiality of the evidence," *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (internal quotation marks and citation omitted), and determines "whether the evidence and reasonable inferences from the record support {the agency's} finding." *Daewoo Elecs. Co. v. Int'l Union of Elec., Tech., Salaried & Mach. Workers, AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (internal quotation marks and citation omitted). Commerce must provide a

"rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

## V. SUMMARY OF ARGUMENT

Commerce's critical circumstances determination for separate rate companies is supported by substantial evidence and is not otherwise contrary to law. First, Commerce was within its discretion not to conduct a seasonality analysis of imports of LSPTVs, especially given the lack of record evidence on this issue. Interested parties did not provide any evidence linking the seasonality of the LSPTV industry to seasonal fluctuations in imports. Given the lack of such evidence, Commerce could not have conducted such an analysis.

Second, Kangdi's claim that the GTA import data under HTSUS 8703.10.5030 that Commerce used in its critical circumstances analysis is an overly broad "basket category" and includes nonsubject merchandise is unavailing. This is the primary tariff category for subject merchandise, and the record lacks any evidence indicating the extent to which the GTA import data includes nonsubject merchandise. As such, Kangdi's allegation is purely hypothetical.

## VI. ARGUMENT

### A. Legal Framework

Pursuant to 19 U.S.C. § 1673d(a)(3), Commerce will make an affirmative critical circumstances finding where (1) there is a history of dumping and material injury by reason of dumped imports in the United States or elsewhere of the subject merchandise, or the person by whom the subject merchandise was imported knew or should have known that the exporter was selling the subject merchandise at less than its fair value and that there would be material injury by reason of such sales and (2) there have been massive imports of the subject merchandise over a relatively short period.

In determining whether imports of subject merchandise have been "massive," Commerce will normally examine: (i) the volume and value of the imports; (ii) seasonal trends; and (iii) the share of domestic consumption accounted for by the imports. *See* 19 C.F.R. § 351.206(h). Commerce normally compares the change in the volume and value of imports between the period immediately preceding the filing of the petition (*i.e.*, the "base period") with the period following the filing of the petition (*i.e.*, the "comparison period"). In order to reach an affirmative critical circumstances determination, imports must have increased by at least 15 percent between the base and comparison periods. 19 C.F.R. § 351.206(h)(2).

Commerce's practice is to review seasonality in the industry under the investigation and, if seasonal trends are found, then examine respondent data to examine if the seasonal trends explain the change in imports in the comparison period. *See* IDM at 14 (citing to Issues and Decision Memorandum accompanying *1,1,1,2-Tetrafluroethane from the People's Republic of China*, 79 Fed. Reg. 62,597 (Dep't Commerce Oct. 20, 2014) (final deter. of sales at less than fair value) at cmt. 6).

Respondents bear the burden of demonstrating seasonality. *See* IDM at 14; *see also* Issues and Decision Memorandum accompanying *Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China*, 80 Fed. Reg. 34,888 (Dep't Commerce June 18, 2015) (final affirmative deter., and final affirmative critical circumstances deter., in part) at cmt. 23. Commerce "cannot assume that the nature of the production and sale of . . . subject merchandise" is seasonal and, therefore, requires that a party alleging seasonality "provide{} . . . evidence that links its shipment data to seasonal changes." Issues and Decision Memorandum accompanying *Refined Brown Aluminum Oxide (Otherwise known as Refined Brown Artificial Corundum or Brown Fused Alumina) from the People's Republic of China*, 68 Fed. Reg. 55,589 (Dep't Commerce Sep. 26,

2003) (notice of final deter. of sales at less than fair value) at cmt. 2 ("*Brown Aluminum Oxide* IDM").

### B. Commerce's Critical Circumstances Determination for Separate Rate Companies Was Supported by Substantial Evidence and Otherwise In Accordance With Law

#### *1. Commerce Reasonably Declined to Conduct a Seasonality Analysis*

Kangdi argues that Commerce's affirmative critical circumstances determination for separate rate companies is not supported by substantial evidence because Commerce failed to conduct a seasonality analysis of imports of LSPTVs. Specifically, Kangdi argues that because the record contained historical LSPTV import data and, according to Kangdi, this data showed that imports of LSTPVs were seasonal, Commerce was required to conduct a seasonality analysis. *See* Kangdi's Br. at 10-12. Kangdi's argument fails.

As Defendant correctly explained, Commerce's longstanding practice places the burden of demonstrating seasonality on the parties subject to the investigation. *See* Def.'s Response to Pls.' Mots. for J. on the Agency R. (Sep. 2, 2026) at 18-19 (citing *Brown Aluminum Oxide* IDM at cmt. 2 and Issues and Decision Memorandum accompanying *Certain Vertical Shaft Engines Between 99cc and Up to 225cc, and Parts Thereof, from the People's Republic of China*, 86 Fed. Reg. 14,077 (Dept. Commerce Mar. 12, 2021) at cmt. 1), ECF No. 35 ("Def.'s Resp."); *see also* Issues and Decision Memorandum accompanying *Certain Quartz Surface Products from the People's Republic of China*, 84 Fed. Reg. 23,767 (Dep't Commerce May 23, 2019) (final affirm. deter. of sales at less than fair value, and final affirm. deter. of critical circumstances) at cmt. 2 ("{T}he burden of demonstrating seasonality is on the respondents.").

Given that neither Kangdi nor any other respondent provided *any* information linking increases in LSPTVs to seasonal trends, there was not sufficient information on the record for Commerce to conduct a seasonality analysis. *See* IDM at 15. As Commerce explained, respondents

"argued and raised the issue of seasonality for the first time in their case briefs for Commerce to account for seasonality in its critical circumstances" and no parties timely placed data on the record demonstrating that trade in LSPTVs is seasonal. *Id.*

Kangdi argues that Commerce should have performed a seasonality analysis because the record contained LSPTV import data from January 2021 to August 2024, claiming that this information "clearly demonstrates the seasonal trends of subject merchandise in the three calendar years prior to the year the petition was filed." Kangdi's Br. at 12. However, Kangdi's argument misses the point. Commerce's seasonality analysis requires that parties demonstrate that their imports are seasonal by linking import increases to seasonality in the industry—it is not simply an analysis of overall import trends. As Commerce explained in the antidumping investigation of *Certain Paper Shopping Bags from China*:

> {T}o conduct a seasonality analysis, Commerce must base seasonality determinations on respondent data as well as on U.S. imports of non-selected producer/exporters for a period sufficiently long to establish a pattern of seasonal trends . . . Neither {of the mandatory respondents} provided U.S. import data prior to April 2022. Therefore, . . . we preliminarily determine neither company has provided the requisite seasonality import volume data to demonstrate that the increase in shipments between the base and comparison period is explained by seasonal trends.

Decision Memorandum accompanying *Certain Paper Shopping Bags from the People's Republic of China*, 89 Fed. Reg. 344, (Dep't Commerce Jan. 3, 2024) (prelim. affirmative deters. of sales at less than fair value, prelim. affirmative deter. of critical circumstances, postponement of final deter., and ext. of provisional measures) at 31 ("*Paper Shopping Bags from China* PDM"), unchanged in Issues and Decision Memorandum accompanying *Certain Paper Shopping Bags from the People's Republic of China*, 89 Fed. Reg. 45,823 (Dep't Commerce May 24, 2024) (final affirm. deter. of sales at less than fair value and final affirm. critical circumstances deter.) at 13-15 ("*Paper Shopping Bags from China* IDM"); *see also* Issues and Decision Memorandum

accompanying *Pentafluorethene (R-125) from the People's Republic of China*, 87 Fed. Reg. 1,117 (Dep't Commerce Jan. 10, 2022) (final affirm. deter. of sales at less than fair value and final affirm. deter. of critical circumstances, in part) at cmt. 1 ("Here, A-Gas neither argued nor placed data on the record demonstrating that trade in R-125 is seasonal. Rather, A-Gas raised the issue of seasonality for the first time in its case brief and only pointed to Sanmei's reported seasonality data to support its claim. Therefore, because we only have data on the record to examine the seasonality of Sanmei's shipments . . . we continue to limit our seasonality analysis to Sanmei, and we have not examined the seasonality of the R-125 industry as a whole . . . .").

In other words, Commerce requires more than just import statistics in order to conduct a seasonality analysis—it requires additional information to substantiate that any alleged seasonal changes in imports are actually the result of seasonal trends in the relevant industry. Here, neither Kangdi nor any other party provided any such information. Indeed, in its case brief, Kangdi did not attempt to link increases in imports in the second half of the calendar year to seasonality in the LSPTV industry, instead it merely hypothesized that these alleged increases (which were inconsistent and varied significantly from year to year) were the result of seasonal trends in the LSPTV industry. *See* Kangdi's Case Br. at 7-8. As the Department explained, it was unable to analyze the seasonality of the LSPTV industry in light of Kangdi's "unsubstantiated" arguments, IDM at 15, and Kangdi cited to no authority to support its contention that Commerce must examine allegations of seasonality where a party has provided no information to support its allegation other than import data. *See generally* Kangdi's Case Br. Thus, just as in *Certain Paper Shopping Bags from China*, Commerce was justified finding there was insufficient record evidence to perform a seasonality analysis and determining that imports for separate rate companies were massive, *see*

*Paper Shopping Bags from China* IDM at 14-15, and the Court should sustain Commerce's determination.[1]

***2. Commerce's Reliance on Import Data Under HTSUS Subheading 8703.10.5030 is Supported by Substantial Evidence***

Kangdi next argues that Commerce's reliance on import data under HTSUS subheading 8703.10.5030 to determine whether imports by separate rate companies were massive was not supported by substantial evidence. Kangdi's Br. at 12-16. Specifically, Kangdi argues that reliance on this data was unreasonable because HTSUS 8703.10.5030 is a basket category and includes a substantial volume of out-of-scope merchandise. *See id.* at 14-16. Kangdi is incorrect.

It is Commerce's practice to use import data for subject merchandise minus the mandatory respondents' shipment volumes when conducting critical circumstances analysis for respondents that are not individually investigated. *See, e.g.*, PDM at 36; Decision Memorandum accompanying *Certain Monomers and Oligomers from Taiwan*, 90 Fed. Reg. 43,409 (Dep't Commerce Sep. 9, 2025) (prelim. affirm. deter. of sales at less than fair value and prelim. affirm. deter. of critical circumstances) at 12; *Paper Shopping Bags from China* PDM at 30. Commerce will only rely on the combined volume of imports by mandatory respondents to determine whether there have been massive imports by separate rate companies if the HTSUS subheading under which subject imports are made is a basket category under which non-subject merchandise enters. *See* Issues and Decision accompanying *Certain Pea Protein from the People's Republic of China*, 89 Fed. Reg.

[1] The Coalition notes that, even had Kangdi or other interested parties provided evidence of seasonality in the LSPTV industry, such that substantial evidence supported the fact that imports usually increased in the second half of the year, they still would not explain the massive increase in volume from the base to comparison period. Indeed, the import data showed that imports for separate rate companies increased by far more than the 15 percent threshold for finding that imports were massive. Final Critical Circumstances Analysis at Attachment I. In other words, given the magnitude of the increase in imports from the base to comparison period, any alleged seasonality in the industry would still not explain the massive increase.

55,559 (Dep't Commerce July 5, 2024) (final affirm. deter. of sales at less than fair value and final affirm. critical circumstances deter.) at 37.

Commerce followed its practice here, relying on import data under HTSUS 8703.10.5030 and subtracting the mandatory respondents' shipment volumes from that data to determine whether import volumes for separate rate companies were massive. IDM at 13. As Commerce explained, use of import data under HTSUS 8703.10.5030 in its critical circumstances analysis was appropriate here because it is the tariff subheading under which LSPTVs are typically classified, and nothing on the record indicated that it was not reliable. *Id.* at 13-14.

Kangdi claims that 8703.10.5030 is non-specific to LSPTVs and includes a substantial volume of irrelevant, out of scope merchandise.[2] *See* Kangdi's Br. at 15. First, Kangdi is incorrect

---

[2] In making this argument, Kangdi cites to numerous cases discussing Commerce's selection of surrogate value data which are inapposite here. *See* Kangdi's Br. at 12-14. Commerce's selection of surrogate values must be specific to a particular input because the surrogate values are used to value factors of production; thus, any non-subject merchandise accounted for in the HTSUS data under a particular subheading would distort the value of such merchandise (*e.g.*, if other products imported under a particular HTSUS subheading were higher or lower priced than the input which is being valued). Furthermore, in the cases to which Kangdi cites, the court's remanded Commerce's selection of surrogate values not because they were basket categories, but because the record suggested that the HTSUS contained significant quantities of merchandise that was not specific to the input being valued. For example, in *Longkou Haimeng Machinery Co. v. United States*, 581, F. Supp. 2d 1344, 1361 (Ct. Int'l Trade 2008), record evidence suggested that 70 percent of imports under a particular HTSUS code "is not used, and cannot be used, to produce the subject merchandise." Likewise, in *Vinh Hoan Corp. v. United States*, 179 F. Supp. 3d 1208, 1228 (Ct. Int'l Trade 2016), the court found that Commerce's selection of data under a particular HTSUS subheading was not supported by substantial evidence due to record evidence that the data was not specific to the input in question. Similarly, in *Peer Bearing Co.-Changshan v. United States*, 884 F. Supp. 2d 1313, 1332-33 (Ct. Int'l Trade 2012), the court found that Commerce's selection of data under a particular HTSUS code was not supported by substantial evidence because Commerce had specifically stated that the particular HTSUS code was not specific to the input in question. Here, to the contrary, there is no record evidence suggesting that HTSUS 8703.10.5030 is not specific to LSPTVs or that it includes non-subject merchandise. *See* IDM at 13-14. Kangdi fails to point to any information on the record attempting to quantify or explain the alleged volume of non-subject imports reported under HTSUS 8703.10.5030. *See generally* Kangdi's Br.; Kangdi's Case Br. Because HTSUS 8703.10.5030 unambiguously covers golf carts, Kangdi's argument boils down to an allegation that some unidentified importers may have

that HTSUS 8703.10.5030 is a "basket category," and that Commerce acknowledged this in its final determination. *Id.* at 16. As an initial matter, Commerce never stated that HTSUS 8703.10.5030 is a basket category. What Commerce instead acknowledged is that HTSUS subheadings 8703.10.5060 and 8703.90.00100—other subheadings under which subject merchandise could potentially be entered under—were broader basket categories that contained both subject and non-subject merchandise. IDM at 13.

HTSUS 8703.10.5030, on the other hand, applies specifically to "golf carts" (*i.e.*, subject merchandise) and is not a basket category. *See, e.g.*, Petitions For the Imposition of Antidumping and Countervailing Duties, *Certain Low Speed Personal Transportation Vehicles From the People's Republic of China*, vol. I (June 20, 2024) at Exhibit I-11, C.R. 2, P.R. 2 ("Petition"). As the courts have acknowledged, "{a} basket provision is not a specific provision," *R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1354 (Fed. Cir. 2014) (quoting *Int'l Bus. Machs. Corp. v. United States*, 152 F. 3d 1332, 1338 (Fed. Cir. 1998), and merchandise falls within a basket provision if it is "not specified or included elsewhere" in the HTSUS. *Nat'l Presto Indus. Inc. v. United States*, 783 F. Supp. 2d 1287, 1292 (Ct. Int'l Trade 2011). HTSUS 8703.10.5030 is thus clearly not a basket category as it specifically provides that it only applies to imports of golf carts. As golf carts fall squarely within the scope of the investigation, all Chinese imports entering under HTSUS 8703.10.5030 would be in scope.

Regardless, even if HTSUS 8703.10.5030 was a basket category, Commerce is not barred from using this data. This is particularly true where no record information indicates that the data

---

misclassified an unspecified amount of entries under HTSUS 8703.10.5030. This argument is unsupported by any factual information quantifying the amount (if any) of potentially misclassified entries, and does not render the critical circumstances data unusable. Indeed, absent such information showing that merchandise other than LSPTVs was entered under this subheading, Commerce could not have reasonably found the GTA data to be unreliable.

in the basket category includes nonsubject merchandise. *See, e.g.*, *Jacobi Carbons AB v. United States*, 422 F. Supp. 3d 1308, 1313 (Ct. Int'l Trade 2019) ("While {HTSUS} 2701.11 is a basket category such that the data reported thereunder could include products distinct from the type of anthracite coal consumed for Jacobi's production, that hypothetical possibility, alone, is insufficient to indicate that the Indonesian data are not specific to Jacobi's anthracite coal."). The burden is on Kangdi to provide information demonstrating that the GTA data under HTSUS 8703.10.5030 includes nonsubject merchandise, *see, e.g.*, *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("The burden of creating an adequate record lies with interested parties and not with Commerce." (internal markings omitted)); *Blue Field (Sichuan) Food Indus. Co. v. United States*, 949 F. Supp. 2d 1311, 1328 (Ct. Int'l Trade 2013) (collecting cases upholding Commerce's use of basket data where plaintiffs provided no alternative data or evidence that use of such data was unreasonable), yet Kangdi did not provide any such evidence. As such, Kangdi's claim that the GTA data on which Commerce relied for its critical circumstances analysis for separate rate companies is purely hypothetical, and the court should reject it.

Second, Kangdi's reliance on the Commission's statement that imports under HTSUS 8703.10.5030 include "an unknown quantity of out-of-scope merchandise" to establish that Commerce may not use the GTA data in its critical circumstances analysis is unavailing. *See* Kangdi's Br. at 15. Defendant correctly notes that while the record of the Commission's preliminary determination may have indicated that there was some amount of non-subject merchandise imported under HTSUS 8703.10.5030, nothing on the record in Commerce's antidumping investigation indicated this was the case, Def.'s Br. at 21, which Commerce explained in the final determination. *See* IDM at 14. Indeed, the data on which the Commission relied on in its preliminary determination is a completely different data set than that relied on by Commerce

here. While the Commission used official import data from the Census Bureau, Commerce relied on GTA data. *Compare Low Speed Personal Transportation Vehicles from China*, Inv. Nos. 701-TA-731 and 731-TA-1700, USITC Pub. 5533 (Aug. 2024) (Prelim) at IV-1 n.2 ("USITC Pub. 5533") (using official import statistics of the U.S. Department of Commerce Census Bureau) *with* IDM at 14 (using GTA data). Regardless, the Commission did not conclusively claim that imports under HTSUS 8703.10.5030 include a substantial amount of out-of-scope merchandise, noting only that they "maybe {sic} overstated." USITC Pub. 5533 at IV-1 n.2.

Finally, contrary to Kangdi's claims, the record does not establish that the GTA data for Chinese imports under HTSUS 8703.10.5030 are overinclusive and include nonsubject merchandise. *See* Kangdi's Br. at 15. While Kangdi claims that the Coalition admitted to this in the petition, the Coalition's statement was made with respect to a different set of import data (*i.e.*, USITC Dataweb), involving a different importing country (*i.e.*, Japan), and based on analysis of import AUVs. *See* Petition at 29, Exhibit 13. Further, nothing in the USITC Dataweb import data suggests that import data under HTSUS 8703.10.5030 *from China* includes nonsubject merchandise, nor does Kangdi point to any record information suggesting this is the case. *See* Kangdi's Br. at 15; Kangdi's Case Br. at 2-8.

Accordingly, Commerce's determination to use the GTA import data for its critical circumstances analysis was supported by substantial evidence and the Court should sustain Commerce's determination to rely on it.

## VII. CONCLUSION

For the reasons described above, the court should sustain these aspects of Commerce's *Final Determination*.

Respectfully submitted:

*/s/ Robert E. DeFrancesco, III*
Robert E. DeFrancesco III, Esq.
Derick G. Holt, Esq.
Theodore P. Brackemyre, Esq.
Stephen A. Morrison, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the American Personal Transportation Vehicle Manufacturers Coalition*

Dated: October 26, 2026

CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedure 2(B)(1), the undersigned certifies that these comments comply with the word limitation requirement. The word count for the Response Brief of the American Personal Transportation Vehicle Manufacturers Coalition, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 4,436 words.

*/s/ Robert E. DeFrancesco, III*
(Signature of Attorney)

Robert E. DeFrancesco, III
(Name of Attorney)

The American Personal Transportation Vehicle Manufacturers Coalition
(Representative Of)

October 26, 2026
(Date)